# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **JANET D. ARDOIN** | * | **CIVIL ACTION NO. 06-0064** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Janet D. Ardoin, born June 23, 1960, filed an application for a period of disability and disability insurance benefits on June 30, 2003, alleging disability as of December 24, 2002, due to difficulties with balance and vertigo, obesity, hypertension, diabetes, and Dandy's Syndrome.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:[1]

**(1) Records from Lake Charles Memorial Hospital dated January 6, 2002 to January 10, 2004,** On December 26, 2002, claimant was admitted for a large abdominal wall abscess in the suprapubic area. (Tr. 353). She had a history of diabetes mellitus Type 2, high blood pressure, and obesity. (Tr. 354). Dr. Thomas Rossowski performed surgery and debridement. (Tr. 505, 614). The diagnosis was necrotizing fasciitis. She received IV antibiotic therapy through January 6, 2003, then was transferred to a skilled nursing facility for further IV antibiotics. (Tr. 504, 614).

After her discharge on January 16, claimant started having dizziness and weakness three to four days later. (Tr. 649, 655). She was then admitted for acute renal failure, hyperkalemia, and dehydration. Dr. Tony Leung's impression was acute nonoliguric renal failure with severe hyperkalemia, most likely secondary to acute interstitial nephritis (antibiotic related and volume depletion), Type 2 diabetes mellitus, chronic hypertension, a history of necrotizing faciitis which appeared to be healing well, and obesity. (Tr. 281, 649). Claimant's renal insufficiency gradually

---

[1] Some of these records are duplicative.

resolved to the point where she was discharged in improved condition. (Tr. 266).

On May 29, 2003, claimant was admitted for a complex abscess of the left face. (Tr. 771-799). Dr. Rossowski performed an incision and drainage on the abscess. There were no complications. (Tr. 771, 796). Her wound healed without signs of infection. (Tr. 906).

**(2) Records from Dr. Reynard C. Odenheimer dated April 7, 2003 to May 9, 2003**. On April 23, 2003, claimant complained of persistent disequilibrium, headaches, and poor sleep. (Tr. 126). Thyroid function studies and an MRA of the brain were normal. (Tr. 117, 122). An MRI of the brain revealed periventricular end vessel changes and white matter disease. (Tr. 117). EMG nerve condition studies revealed bilateral carpal tunnel syndrome. (Tr. 115-16). Dr. Odenheimer's impression was carpal tunnel syndrome, dizziness, sleep disturbance, headache, gait disturbance, and encephalopathy. (Tr. 117).

**(3) Residual Functional Capacity Assessment dated September 18, 2003**. The medical examiner determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently. (Tr. 297). She could stand/walk at least 2 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. She had unlimited push/pull ability. She could occasionally climb ramps and stairs, never climb ladders/ropes/scaffolds, and frequently stoop, kneel, crouch, and crawl. (Tr.

3

298). She was to avoid all exposure to hazards, such as machinery, heights, etc. (Tr. 300).

**(4) Records from Center for Balance Disorders dated to July 22, 2003 to May 5, 2004**. On July 22, 2003, claimant complained of disequilibrium and oscillopsia. (Tr. 815). Dr. Newton Cocker found that testing results were consistent with bilateral vestibular loss. (Tr. 817, 1142). Balance therapy was recommended. (Tr. 815).

On November 18, 2003, claimant continued to complain of blurred vision and oscillopsia. (Tr. 807). She was unable to see clearly while moving or riding in a vehicle. She had difficulty walking on even and uneven surfaces. She continued with therapy.

On December 9, 2003, claimant continued to have significant ataxia, severe oscillopsia, and visual motion sensitivity. (Tr. 806). Her performance on all tasks improved slightly during the visit. She was given a home program.

On December 29, 2003, Dr. Melton J. Horwitz completed a Long Term Disability Plan-Attending Physician's Statement from BellSouth indicating that claimant's primary diagnosis was vertigo secondary to ototoxicity, and that she had Dandy's syndrome. (Tr. 804). Her objective findings were a broad-based, unstable gait, and her subjective symptoms included constant dizziness and oscillopsia on

4

walking.

Dr. Horwitz expected claimant's condition to last for more than 6 months. (Tr. 805). He stated that she could not drive, climb, bend, or do any heavy lifting, or walk without assistance or in the dark. He classified her impairment as moderate. He found that she had a "[s]evere limitation of functional capacity/incapable of sedentary work." He concluded that "[n]o significant medicine or surgical treatment can reverse or improve this condition."

On April 27, 2004, claimant's gait was still grossly ataxic, and she lost her balance in dim lighting. (Tr. 802). She also reported having motion sickness when riding in a car at night, and falling several times. She said that she was unable to read a sign if the car was moving. It was recommended that she continue with bi-weekly balance therapy with occupational or physical therapy.

**(5) Records from Diagnostic Clinic of Houston May 23, 2003 to May 6, 2004**. On May 23, 2003, claimant complained of dizziness and being off-balance. (Tr. 884, 1096). On examination, she had a mild peripheral neuropathy and a very positive rhomberg sign, for which Dr. Brian Loftus recommended an MRI. (Tr. 138, 850, 885, 1097).

An MRI of the cervical spine showed a left-sided C6-7 disk which touched the spinal cord and deformed it, but no evidence of cord compression. (Tr. 848, 882,

5

1094). An MRI of the thoracic spine showed a mid-thoracic disc at T6-7 and no cord compression. (Tr. 846, 882, 1094). On June 11, 2003, Dr. Loftus noted that claimant clearly appeared to have been exposed to high levels of gentamycin and vancomycin, and that her symptom complex appeared compatible with ototoxicity related to the gentamycin. (Tr. 135, 883, 1095). The assessment was abnormal vestibular function studies and abnormality of gait.

On September 2, 2003, claimant was seen by Dr. Carolyn A. Smith for a sedimentation rate of 110. (Tr. 289). She felt tired, but otherwise well. Dr. Smith's impression was elevated sedimentation rate, etiology unclear. (Tr. 291).

Claimant continued to complained of dizziness, vertigo, and being unsteady on her feet. (Tr. 1077-79). Her blood sugar and hypertension were not well-controlled. (Tr. 1057, 1077, 1079). Dr. Nizar A. Dholakia noted that claimant needed to diet and exercise, and have better sugar control. (Tr. 1080).

On April 27, 2004, claimant complained that she was still unsteady on her feet and was fatigued. (Tr. 1056). She was noncompliant with her diet. Dr. Dholakia's assessment was diabetes mellitus, fatigue, hypothyroidism, and obesity.

**(6) Report from Glenn M. Hebert, MRC, dated June 24, 2004**. Mr. Hebert stated that based upon the information he had and the interviews with Drs. Horwitz and Cohen, he believed that claimant did not have the ability to do any substantial

6

gainful activity for the remainder of her adult work life. (Tr. 1105, 1146).

**(7) Claimant's Administrative Hearing Testimony**. At the hearing on August 18, 2004, claimant testified that she was a high school graduate. (Tr. 1164). She had also taken some computer courses at night. (Tr. 1165). She had worked for BellSouth as a 411 operator, and had made crafts at home. (Tr. 1156, 1172-73).

Claimant testified that she had stopped working for BellSouth after she had surgery for a pubic abscess and had a reaction to antibiotics. (Tr. 1156-57). She reported that she had been approved for long-term disability with the company on January 1. (Tr. 1151-52).

Regarding complaints, claimant testified that she had vision problems and nausea. (Tr. 1157). She also complained of memory and concentration problems, problems with falling and walking on even surfaces, and problems with walking in the dark. (Tr. 1158-59). Additionally, she stated that she did not drive because she could not read signs and became carsick. (Tr. 1159).

Claimant testified that she had to hang onto the walls and furniture for balance. (Tr. 1161). She stated that the therapist had given her several exercises for tandem stepping and side stepping, which had helped some. She reported that she could see fine as long as she did not turn her head, which caused blurred vision and bouncing images. (Tr. 1163, 1164).

7

**(8) Administrative Hearing Testimony of Jeffrey J. Peterson, Vocational Expert ("VE")**. Mr. Peterson classified claimant's past work as a telephone operator as sedentary and semi-skilled, and craft builder as medium and semi-skilled. (Tr. 1175). The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience; who had visual disturbances any time she moved her head of a jumping effect with her vision; who got vertigo from looking at patterns of brick while walking, and who had problems at night, including nausea from driving or even more vision problems. (Tr. 1175-76). In response, Mr. Peterson testified that she would not be able to do her past work. (Tr. 1176). He clarified that she would not be able to work as a telephone operator because of her visual problems and nausea from moving her head. (Tr. 1176-77). He further testified that there would be no other work that she could do. (Tr. 1177).

**(9) The ALJ's findings**. Claimant argues that the ALJ erred in finding that she was not disabled. Specifically, she contends that she is unable to work because of bilateral peripheral vestibular pathology, ototoxicity, bilateral vestibular loss, damage to the eight nerve of the ear secondary to antibiotic toxicity, Dandy's syndrome, oscillopsia, and vestibular ocular reflex dysfunction. (rec. doc. 10, p. 2). Because the ALJ failed to find that claimant was disabled, I find that this case should be **REVERSED,** and that claimant should be awarded benefits as of December 24, 2002,

which was her onset date.

The record reflects that claimant's treating physician, Dr. Melton J. Horwitz, diagnosed her with vertigo secondary to ototoxicity and Dandy's syndrome. (Tr. 804). Her objective findings were a broad-based, unstable gait, and her subjective symptoms included constant dizziness and oscillopsia on walking. Dr. Horwitz opined that claimant could not drive, climb, bend, do any heavy lifting, walk without assistance or walk in the dark. He found that she had a "[s]evere limitation of functional capacity/incapable of sedentary work." (Tr. 805).

At the hearing, the ALJ posed a hypothetical in which he asked the vocational expert, Jeffrey Peterson, whether any work would be available to a claimant who had visual disturbances any time she moved her head, vertigo, and problems at night including nausea from driving and more vision problems. (Tr. 1175-76). In response, Mr. Peterson testified that she would not be able to do her past work as a telephone operator because of her visual problems and nausea. (Tr. 1176-77). He further testified that there would be no other work that she could do. (Tr. 1177).

In the decision, the ALJ noted that Dr. Horwitz had limited claimant only from driving, bending, and heaving lifting, and did not limit her from sitting, using her eyes to focus, or using her arms. (Tr. 19). He further observed that the record failed to establish that she had consistently complained of an inability to sit or to use her

9

arms, or of an inability to focus while sitting down. However, he gave no basis for rejecting Dr. Horwitz's finding that claimant had a severe limitation of functional capacity and was incapable of sedentary work.

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with ... other substantial evidence.*" (emphasis added). *Newton,* 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)). Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence. *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

In this case, the ALJ did not provide any basis for rejecting Dr. Horwitz's opinion that claimant would be unable to perform sedentary work. It is well

established that the expert opinion of a treating physician as to the existence of a disability is binding on the fact-finder "*unless contradicted by substantial evidence to the contrary*." (emphasis added). *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (quoting *Bastien v. Califano,* 572 F.2d 908, 912 (2d Cir.1978)); *see also* 20 C.F.R. § 404.1527(d)(2). Here, the ALJ has cited no substantial evidence to contradict Dr. Horwitz's findings, and a full review of this record by the undersigned fails to disclose any such substantial evidence. This constitutes error.

Additionally, the ALJ failed to perform the proper analysis in rejecting Dr. Horwitz's opinion. The Fifth Circuit has held that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." (emphasis in original). *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). In *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), the court held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. *Id*. at 621 (citing *Newton,* 209 F.3d at 456). The ALJ did not consider those factors in this case, which constitutes

error.

Accordingly, the undersigned recommends that this case be **REVERSED**, and the claimant be awarded benefits. The undersigned recommends that claimant be awarded benefits as of December 24, 2002, which is the date of onset.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** ***DOUGLASS V. UNITED***

*SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed November 6, 2006, at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE